**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| SHANE R. HAUGEN,<br>SHANE BRYCE HAUGEN,<br>individually and as<br>parent and next friend<br>of K.H., a minor,<br><br>    Plaintiffs,<br><br>v.<br><br>THE CITY OF ORANGE BEACH,<br>ALABAMA; DAVID JOHNSON, in<br>his individual and official capacity<br>as Chief of the Orange Beach<br>Police Department; ANDREW<br>BRYANT, in his individual and<br>official capacity as an officer of the<br>Orange Beach Police Department;<br>and OFFICERS JOHN/JANE<br>DOES 1–10, in their individual<br>and/or official capacities,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No.<br>)<br>)<br>)<br>)<br>) JURY TRIAL DEMANDED<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>COMPLAINT</u>

COMES NOW Plaintiffs Shane R. Haugen ("Shane"), Shane Bryce Haugen ("Bryce"), individually, and Shane Bryce Haugen as parent and next friend of K.H., a minor child (collectively, "Plaintiffs"), by and through undersigned counsel, and for their Complaint against Defendants the City of Orange Beach, Alabama (the "City"), Chief of Police David Johnson, in his individual and official capacities (the "Chief"), Officer Andrew Bryant, in his individual and official capacities ("Officer Bryant") and Officers John/Jane Does 1–10, in their individual and/or official capacities (collectively, the "Individual Defendants"), state as follows:

1

## NOTICE REGARDING FICTITIOUS DEFENDANTS

The identities of Officers John/Jane Does 1–10 are not presently known to Plaintiffs because the City has denied and/or delayed Bryce Haugen's and counsel's pre-suit public-records request for the police report, body-worn-camera footage, computer-aided dispatch ("CAD") logs, and personnel records associated with the September 21, 2025 incident that is the subject of this Complaint. Plaintiffs have pleaded the specific role and conduct attributable to each Doe Defendant where presently known. Plaintiffs will move to substitute the true names of each Doe Defendant pursuant to Federal Rule of Civil Procedure 15 promptly upon ascertainment through discovery, and reserve the right to add additional individual defendants—including, without limitation, additional supervisors, training officers, and final policymakers—once their identities and conduct are ascertained.

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Shane R. Haugen is an adult resident citizen of Baldwin County, Alabama, and the owner of the residence located at 24607 Tarpon Lane, Orange Beach, AL 36561 (the "Tarpon Lane Home"). Shane is the paternal grandfather of K.H.

2. Plaintiff Shane Bryce Haugen ("Bryce") is an adult resident citizen of Baldwin County, Alabama, the biological and legal father of K.H., and at all relevant times held sole legal and physical custody of K.H. Bryce resides at the Tarpon Lane Home.

2

3.      K.H. is a minor child who at all relevant times (with the exception of when she was wrongfully abducted) resided at the Tarpon Lane Home with her father Bryce and her grandfather Shane. K.H. brings claims by and through her father and next friend, Bryce, pursuant to Federal Rule of Civil Procedure 17(c).

4.      Defendant City of Orange Beach, Alabama (the "City") is a municipal corporation organized under the laws of the State of Alabama, with its principal offices at 4099 Orange Beach Boulevard, Orange Beach, AL 36561. The City operates and is responsible for the Orange Beach Police Department ("OBPD").

5.      Defendant David Johnson ("the Chief") is the Chief of Police of OBPD and at all times relevant was the final policymaker for the City of Orange Beach with respect to law-enforcement policy, training, supervision, and discipline. He is sued in his individual capacity for damages and in his official capacity for prospective declaratory and injunctive relief.

6.      Defendant Andrew Bryant ("Officer Andrew Bryant") is, and at all times relevant was, a patrol officer employed by OBPD. Based on sworn testimony in the federal criminal proceeding against Haley Leah Harris (the biological mother of K.H.), Plaintiffs are informed and believe, and on that basis allege, that Officer Bryant was the lead patrol officer who responded to the Tarpon Lane Home on September 21, 2025, who classified the incident as a non-criminal "civil" or custody matter, and who directed that K.H. be relinquished to Harris resulting in the abduction of K.H. and her transport to Mexico. Officer Bryant is sued in his individual capacity for damages and in his official capacity for prospective declaratory and

3

injunctive relief. At all relevant times, Officer Bryant acted under color of state law and within the line and scope of his employment by the City.

7.      Defendants Officers John/Jane Does 1–10 are OBPD officers, supervisors, dispatchers, training officers, records custodians, and other personnel whose specific acts or omissions contributed to the harms alleged herein, including: (a) Officer Doe 1, the secondary patrol officer dispatched to that location on that date; (b) Supervisor Doe 2, the Shift Sergeant or Lieutenant or comparable supervisor on duty during and/or consulted in connection with that response; and (c) Does 3–10, other OBPD personnel whose conduct contributed to the harms alleged. Their identities will be substituted by amendment upon discovery.

8.      At all times relevant, each Individual Defendant acted under color of state law and within the line and scope of his or her employment by the City.

9.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)–(4) because this action arises under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution. This Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367(a).

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in Baldwin County, Alabama, within the Southern Division of the Southern District of Alabama.

11.    Plaintiffs have satisfied all applicable pre-suit notice requirements by serving a Verified Notice of Claim on the City of Orange Beach on March 26, 2026, pursuant to Ala. Code §§ 11-47-23 and 11-47-192.

**FACTS**

**A. The Household and Custody Status as of September 21, 2025**

12.    At all times relevant, Bryce was the sole legal and physical custodian of K.H., then aged three. K.H. had resided continuously with Bryce at the Tarpon Lane Home for approximately one year prior to September 21, 2025.

13.    Shane R. Haugen, Bryce's father and K.H.'s paternal grandfather, owned the Tarpon Lane Home and resided there.

14.    Haley Leah Harris ("Harris") is K.H.'s biological mother. As of September 21, 2025, Harris had had no relationship of any kind with K.H. for approximately one year preceding the incident.

15.    Harris is and at the time of the subject incident was the girlfriend and known associate of an illegal alien, Pedro Padraza who, upon information and belief, has a documented history of illegal conduct against children, ties to drug-trafficking cartels, and was a fugitive from justice and/or had been deported from the United States (the "Co-Conspirator"). Information regarding the Co-Conspirator's status and criminal history would have been ascertainable through routine law enforcement databases and procedures that any properly trained officer would have and should have employed in investigating the circumstances surrounding Ms. Harris, had those officers taken the situation seriously instead of summarily casting it as a "civil

matter" to avoid the time, effort, and record-keeping that is necessary for a proper criminal investigation.

**B. The Home Invasion of September 21, 2025**

16.    In the early-morning hours of September 21, 2025, at approximately 8:00 a.m., Harris arrived at the Tarpon Lane Home accompanied by Mikayla Woodruff, who drove Harris there in a rented vehicle. Bryce's brother, Scottie Haugen, answered the door and told Harris and Woodruff that it was not a good time and that everyone was asleep.  Notwithstanding that statement, Harris and Woodruff entered the home, without permission and without lawful authority.  This, in and of itself, is a prosecutable crime.

17.    Once inside, Harris and Woodruff took personal property belonging to Shane and/or Bryce.  This, too, is a prosecutable crime.

18.    Harris and Woodruff proceeded to Bryce's bedroom, where K.H. was asleep in her crib and Bryce and his girlfriend were sleeping. Woodruff lifted K.H. from her crib and handed her to Harris. Harris and Woodruff then took physical custody of K.H. and removed her from the home, against the will of her sole legal custodian.

19.    Awakened by the commotion, Shane and Bryce called 911 and requested immediate assistance from OBPD because their home had been broken into, their property was being stolen, and K.H. was being abducted.

### C. OBPD's Response at the Scene

20.     In response to the 911 call, the City dispatched Officer Andrew Bryant and Officer Doe 1 to the Tarpon Lane Home (collectively, the "Responding Officers"). Officer Andrew Bryant, identified through sworn testimony in the federal criminal proceeding against Harris, was the lead patrol officer who responded; he is a patrol officer with approximately nine years of total law-enforcement experience, and his body-worn camera recorded the encounter (although, thus far, the City has refused to produce the body-worn camera footage). The Responding Officers were dispatched on a report characterized only as a "possible domestic dispute over a child custody arrangement," and treated the call from the outset as a non-criminal family or custody matter rather than as what was reported both in the 911 call and on scene—being burglary, theft, and child abduction.

21.     The Responding Officers arrived while Harris, Woodruff, and K.H. were still at or near the scene, or shortly after their departure with K.H.

22.     On arrival, Shane and Bryce reported to the Responding Officers each of the following: (a) that Harris and Woodruff had entered the Tarpon Lane Home through an unlocked door without permission; (b) that Harris had not had any relationship with K.H. for approximately one year; (c) that Bryce was the legal father and sole custodian of K.H.; (d) that Harris and Woodruff had removed property from the home; and (e) that Harris and the Woodruff were attempting to remove three-year-old K.H. from the home.

7

23. The Responding Officers conducted no meaningful investigation. Specifically, the Responding Officers: (a) spoke with Harris and Bryce—both together and separately—and an OBPD body-worn camera recorded portions of those statements, but accepted Harris's unverified representations at face value, dismissed and discounted the statements of Shane and Bryce, took no statement from Woodruff, and did not test, challenge, or investigate the truth of what Harris told them (which was false in material respects, as set forth below); (b) did not examine, photograph, or otherwise document the point of entry; (c) did not collect, preserve, or document any physical evidence; (d) did not identify, separately interview, or run identifying information for Woodruff or any other person accompanying Harris; (e) did not run Harris or her companion through NCIC, the National Sex Offender Public Website, or any comparable database; (f) made no inquiry into the existence or absence of any custody order, did not contact the Baldwin County Circuit Court clerk, and did not request documentary proof of any custodial right held by Harris; (g) did not contact the Alabama Department of Human Resources; (h) did not consult their on-duty Shift Sergeant or any other supervisor before electing to take no enforcement action; and (i) prepared, at most, a report reflecting the incident as a non-criminal custody or "civil" matter, and did not prepare any report documenting the apparent burglary, theft, or child abduction or any criminal investigation thereof.

24. Despite the report of a forcible entry, theft, and the taking of a child from her sole legal custodian, the Responding Officers classified the incident as a "civil matter."

25.    Having so classified the incident, the Responding Officers affirmatively directed Bryce and Shane to relinquish K.H. to Harris.

26.    While the City later tried to portray that Bryce and Harris reached an "agreement," the Responding Officers' direction for Bryce and Shane to relinquish was, in reality, an express and unequivocal mandate with which Bryce and Shane had no choice but to comply; they could not simply refuse the commands and direction of the Responding Officers. But for that direction, Bryce and Shane would have been able and prepared to prevent K.H.'s removal from the home. In sworn testimony in the federal criminal proceeding, Officer Andrew Bryant acknowledged that he told Bryce that "both parents have equal rights" to K.H., and that, because he did not perceive either side to be in danger in what he treated as a civil child-custody dispute, he would not interfere with Harris taking the child. Officer Bryant thus directed the transfer of K.H. without verifying Harris's custodial status, without any court order, without consulting a supervisor, and without conducting an investigation into the criminal behavior that had been reported.

27.    According to information disclosed in federal criminal proceedings against Harris, the Responding Officers' only substantive intervention was to facilitate what they would later call an "agreement" under which Harris was permitted to take possession of K.H. and remove her from the premises. Harris represented that she was residing with a friend in Robertsdale, Alabama, and committed to remain in Baldwin County during that period, despite having no actual intent to do so. In reality, this arrangement was never really an "agreement" by

9

Shane and/or Bryce. The Responding Officers told them this is what would be done, claiming they had no right to keep K.H. from Harris in response to what they were calling a "civil matter."

28. As established by sworn testimony and the defendant's own admissions in the federal criminal proceeding, the representations Harris made to the Responding Officers were false: Harris told the Responding Officers that she had been living in Washington (when she had in fact been living in Mexico), that she was moving in with Woodruff in Robertsdale to establish residency and find a place to live, and that she would keep K.H. in Robertsdale for approximately a week before returning her to Bryce. Each of these statements was knowingly false; Harris had no intention of remaining in Baldwin County and instead intended to remove K.H. and take her to Mexico. Bryce's family also advised the Responding Officers on scene that Harris had ties to Mexico and was likely to take the child there. Had the Responding Officers conducted any meaningful investigation or verification, the falsity of Harris's representations and the risk of international removal of a child who had no passport would have been apparent. Even if they had reasonably believed the situation was a "civil matter," the only appropriate solution would have been to leave K.H. with Bryce and Shane—where she had a bed and had been living for the entire preceding year— versus allowing an uninvolved parent to break into the home, awaken her, and take her.

29. Harris had, in fact, traveled to Pensacola, Florida from San Diego the day before the September 21, 2025 incident—and thus was not residing in

10

Robertsdale as she represented to the Responding Officers. Immediately upon leaving the Tarpon Lane Home with K.H., Harris asked to be transported to the airport, consistent with a pre-arranged plan to flee the jurisdiction. Harris thus violated, almost immediately, the Responding Officers' "agreement" that they essentially forced upon Shane, Bryce, and K.H. The Responding Officers' facilitation of that "agreement," without any of the investigative steps required by OBPD policy, created and in fact actively facilitated the abduction that followed.

30.    In reliance on the Responding Officers' directive, in deference to the rule of law, and in compliance and deference to the Responding Officers' authority (whom they had called for help), Bryce and Shane had no choice but to allow Harris to depart with K.H.

31.    Supervisor Doe 2, as the on-duty supervisor, either approved the Responding Officers' classification and disposition in real time or ratified it after the fact through the absence of corrective action, investigation, or discipline.

**D. The Consequences**

32.    Within hours of leaving the Tarpon Lane Home, Harris transported K.H. away from Orange Beach, Alabama to the Pensacola airport, where she boarded a plane bound for California.

33.    After Harris reached San Diego, California with K.H., she then crossed the United States–Mexico border with K.H. into Mexico via a pre-arranged transport/trafficker.

11

34.    In Mexico, K.H. was held by, abused by, and exposed to cartel actors and to elements of the Mexican government acting in concert with or with the acquiescence of those cartel actors. K.H. suffered physical and psychological harm during this period.

35.    K.H. was returned to the United States and eventually to Bryce only as a result of intervention and intercession of federal law enforcement and Members of the United States Congress.  Upon and since returning, K.H.'s behavior has noticeably changed as a result of being ripped from her home, her father, and her lifestyle. She acts distant and confused, and scared due to her treatment in Mexico. Bryce and Shane have been left to try to navigate the fallout and re-establish their relationships. For months, K.H. was terrified to leave Bryce's side for fear she would be taken again.

36.    Federal authorities have since initiated criminal prosecution of Harris in connection with the events of September 21, 2025, and their aftermath. Harris was charged with international parental kidnapping in violation of 18 U.S.C. § 1204 in United States v. Harris, No. 25-cr-222 (S.D. Ala.), and was tried before a jury in March 2026. After a mistrial to a jury, the United States and Harris agreed to waive a second jury and to submit the charge to the Court for decision on the evidence already presented at the jury trial. On May 18, 2026, Chief United States District Judge Jeffrey U. Beaverstock found Harris guilty of international parental kidnapping; sentencing is set for August 2026. The evidence adduced at the jury trial and relied upon by the Court at the bench trial—including the sworn testimony of

OBPD personnel and the body-worn-camera recording of the September 21, 2025 encounter—confirms the facts alleged herein concerning the conduct and omissions of the Responding Officers.

37. It is particularly noteworthy that, after initially and without any meaningful investigation classifying the September 21, 2025 incident as a "civil matter" and taking no enforcement action (with the exception of essentially handing possession of the minor child to the criminal abductor), OBPD subsequently participated in and cooperated with the federal prosecution of Harris for the very criminal conduct they had initially declined to investigate. This subsequent reversal (following significant publicity and federal involvement surrounding the incident) confirms that the facts presented on September 21, 2025 were sufficient to support criminal investigation at that time; that the initial "civil matter" classification and resulting "agreement" were not the product of legitimate judgment but of failure to train, inadequate policy, or deliberate indifference; and that any qualified immunity defense premised on the non-criminality of the conduct is foreclosed by OBPD's own later conduct.

### E. Post-Incident Conduct by the City

38. After K.H.'s return, Bryce submitted a public records request to the City, seeking the police report, body-worn-camera footage, CAD logs, 911 audio, and related materials concerning the September 21, 2025 response. Bryce's counsel later submitted a similar request.

39.     The City denied Bryce's request in its entirety, and denied or delayed counsel's request (producing only the City's policies and procedures, but withholding all information relating to the actual incident). The City identified no applicable statutory exemption or other lawful basis for the denial. Substantial portions of the requested materials have been or will be disclosed in the federal criminal prosecution of Harris, undermining any plausible privilege or investigative-confidentiality argument.

40.     To date, the City has not initiated, conducted, or completed any internal personnel-complaint investigation arising from the events of September 21, 2025, despite the Verified Notice of Claim served March 26, 2026, and despite OBPD Policy § 1110.3.2(e), which states that tort claims and lawsuits may generate personnel complaints.

### F.  The OBPD Policies the Responding Officers Were Required to Apply

41.     OBPD has adopted, and at all relevant times had in effect, a written Policy Manual administered through Lexipol, LLC. The provisions described in the following paragraphs were triggered by the September 21, 2025 call.

42.     Civil Disputes—Policy § 430.3(b): "Members should not dismiss alleged or observed criminal violations as a civil matter and should initiate the appropriate investigation and report when criminal activity is apparent."

43.     Investigation and Prosecution—Policy § 600.3.1 requires the responding officer to make a preliminary determination of whether a crime has been committed, obtain initial statements, examine for evidence, preserve evidence, identify and

14

interview victims, complainants, witnesses, and suspects, take appropriate law-enforcement action, and complete and submit appropriate reports.

44.     Domestic Violence—Policy § 310 purports to be intended to deter, prevent, and reduce domestic violence through "vigorous enforcement" and defines "domestic violence" by reference to specified relationships, including a parent (§ 310.1.1(f)), grandparent (§ 310.1.1(g)), and persons having a child in common (§ 310.1.1(c)). Section 310.4(a) makes such calls "of extreme importance" and "among the highest response priorities." Section 310.4(j) requires "appropriate enforcement action when there is probable cause to believe an offense has occurred" and forbids declining enforcement based on potential "child custody consequences of arrest." Section 310.9(a) requires an arrest where probable cause exists and requires supervisor approval for any decision not to arrest. Section 310.10(a) requires a written report regardless of whether an arrest is made.

45.     Report Preparation—Policy § 323.5.1 requires written reports for all felony crimes and for situations covered by the Domestic Violence Policy. Section 323.5.2(d) requires documentation of suspicious incidents indicating a potential for crimes against children or that a child's safety is in jeopardy. Section 323.4 prohibits members from "suppress[ing], conceal[ing] or distort[ing] the facts of any reported incident."

46.     Child and Dependent Adult Safety—Policy § 338 provides at § 338.4 that "[u]nder no circumstances should a child or dependent adult be left unattended or without appropriate care," and at § 338.3.1(b)(1) that, except where a court order

limits contact, officers should place a child with the non-arrested parent, guardian, or caregiver.

47. Personnel Complaints—Policy § 1110 requires acceptance, documentation, investigation, and resolution of complaints, including those generated by tort claims (§ 1110.3.2(e)).

### G. The OBPD Policy Gaps That Made the Constitutional Violations Inevitable

48. OBPD's Policy Manual contains no stand-alone policy directing officers' response to a reported child abduction or parental kidnapping not arising from an arrest.

49. OBPD's Policy Manual contains no policy directing officers how to verify custodial status before facilitating the transfer of a child from one adult to another at the scene of a domestic dispute.

50. OBPD's Policy Manual contains no human-trafficking-recognition or response policy, despite Orange Beach's status as a Gulf-coast tourism and short-term-rental destination and despite federal and state statutory frameworks (22 U.S.C. § 7101 et seq.; Ala. Code § 13A-6-150 et seq.).

51. OBPD's Policy Manual provides no decision framework, checklist, or supervisor-consultation requirement for the threshold classification of a call as "civil" rather than "criminal." Section 430.3(b) is stated as a negative prohibition only.

52.     The vendor of OBPD's Policy Manual, Lexipol, LLC, makes available to its subscribers model policies on Missing Persons, Child Abduction, and Human Trafficking. On information and belief, OBPD has elected not to adopt those modules, although it has adopted Lexipol's Civil Disputes, Immigration, and Domestic Violence modules.

53.     The training described in Policy § 338.5 (Child and Dependent Adult Safety) and Policy § 413.9 (Immigration) is left to the discretion of an unspecified "Training Officer," with no curriculum, frequency, certification, or audit requirement specified in policy.

## H.  The Chief's Role and Final Policymaking Authority

54.     Under Alabama law and the City's ordinances, the Chief is the final policymaker for OBPD on matters of law-enforcement policy, training, supervision, and discipline. *See* Ala. Code § 11-43-55.

55.     The Chief is responsible for adopting, omitting, amending, and enforcing the policies described in this Complaint; for ensuring that officers receive adequate training on those policies; and for the discipline, or absence of discipline, imposed on officers who violate those policies.

56.     On information and belief, the Chief has known of, or with reasonable diligence would have known of, prior incidents in which OBPD officers classified reports of apparent criminal conduct (including those involving custody, child

17

welfare, or domestic disputes) as "civil matters" without conducting the investigation required by Policy §§ 430.3(b), 600.3.1, and 310.4(j). Such prior incidents will be the subject of discovery.

### I. Injuries

57.    K.H. suffered, among other injuries: forcible separation from her father and grandfather; transport across state and international borders against her will; physical abuse; psychological trauma, including PTSD-spectrum harms appropriate to her developmental stage; loss of attachment-stage developmental progress; and ongoing medical, psychological, and developmental damages.

58.    Bryce suffered, among other injuries: the loss of physical custody and association with his minor daughter for the duration of her abduction; severe emotional distress; consequential financial losses associated with the search for and recovery of K.H.; impairment of the parent-child relationship; and ongoing loss of consortium.

59.    Shane suffered, among other injuries: invasion of his home; theft of property; severe emotional distress; impairment of his grandparent-grandchild relationship with K.H.; and consequential financial losses.

## COUNT I – SUBSTANTIVE DUE PROCESS – STATE-CREATED DANGER
### (42 U.S.C. § 1983; K.H., by Bryce as next friend, against Officer Andrew Bryant, Officer Doe 1, and Supervisor Doe 2)

60.    K.H. realleges and incorporates by reference the factual allegations set forth in paragraphs 12 through 37 and 57 through 59 of this Complaint.

61.    The Fourteenth Amendment to the United States Constitution protects K.H.'s liberty interest in her bodily integrity and her freedom from state-created exposure to private violence.

62.    Officer Andrew Bryant, Officer Doe 1, and Supervisor Doe 2, acting under color of state law and in concert, engaged in affirmative conduct that placed K.H. in a position of danger she would not otherwise have faced. Specifically, they directed Bryce and Shane—who were able and prepared to prevent K.H.'s removal—to relinquish K.H. to Harris and the Co-Conspirator.

63.    At the time of that directive, Officer Andrew Bryant, Officer Doe 1, and Supervisor Doe 2 knew or should have known: (i) that Harris had just made a forcible entry into the Tarpon Lane Home; (ii) that Bryce was K.H.'s sole legal custodian; (iii) that Harris had had no relationship with K.H. for approximately one year; and (iv) that Harris was accompanied by a Co-Conspirator whose identity had not been verified.

64.    Their affirmative direction was the proximate cause of K.H.'s removal from the home, her interstate transport, her trafficking into Mexico, and the abuse she sustained there.

65.    The conduct of Officer Andrew Bryant, Officer Doe 1, and Supervisor Doe 2 shocks the conscience. It was undertaken with deliberate indifference to, or in reckless disregard of, K.H.'s rights under the Fourteenth Amendment.

66.    As a direct and proximate result, K.H. has suffered the damages alleged in this Complaint.

WHEREFORE, K.H. demands judgment against Officer Andrew Bryant, Officer Doe 1, and Supervisor Doe 2, jointly and severally, for compensatory damages, punitive damages, attorneys' fees and costs under 42 U.S.C. § 1988, and such other relief as the Court deems just.

### COUNT II – PROCEDURAL DUE PROCESS – INTERFERENCE WITH PARENT-CHILD RELATIONSHIP
### (42 U.S.C. § 1983; Bryce, individually, against Officer Andrew Bryant, Officer Doe 1, and Supervisor Doe 2)

67. Bryce realleges and incorporates by reference the factual allegations set forth in paragraphs 12 through 37 and 57 through 59 of this Complaint.

68. The Fourteenth Amendment protects Bryce's fundamental liberty interest in the care, custody, control, companionship, and management of his minor daughter.

69. Officer Andrew Bryant, Officer Doe 1, and Supervisor Doe 2, acting under color of state law, effected the transfer of physical custody of K.H. from Bryce to Harris and the Co-Conspirator without any predicate hearing, without any court order, and without any meaningful verification of Harris's asserted parental claim.

70. The Responding Officers and Supervisor Doe 2 had available, but did not use, the means to verify custodial status set out in OBPD Policy §§ 310.8 and 600.3.1, and made no inquiry of the Baldwin County Circuit Court or any other competent authority.

71. Their conduct deprived Bryce of his protected liberty interest without due process of law.

72.    As a direct and proximate result, Bryce has suffered the damages alleged in this Complaint.

WHEREFORE, Bryce demands judgment against Officer Andrew Bryant, Officer Doe 1, and Supervisor Doe 2, jointly and severally, for compensatory damages, punitive damages, attorneys' fees and costs under 42 U.S.C. § 1988, and such other relief as the Court deems just.

**COUNT III – FOURTH AND FOURTEENTH AMENDMENTS – UNLAWFUL SEIZURE OF K.H.**
**(42 U.S.C. § 1983; K.H., by Bryce as next friend, against Officer Andrew Bryant, Officer Doe 1, and Supervisor Doe 2)**

73.    K.H. realleges and incorporates by reference the factual allegations set forth in paragraphs 12 through 37 and 57 through 59 of this Complaint.

74.    The Fourth Amendment, as applied to the States through the Fourteenth Amendment, protects K.H. against unreasonable seizures of her person.

75.    By directing the transfer of K.H. from her legal custodian to Harris and the Co-Conspirator, Officer Andrew Bryant, Officer Doe 1, and Supervisor Doe 2 caused a seizure of K.H. effected through state action.

76.    The seizure was unreasonable under the Fourth Amendment because it was unsupported by probable cause, court order, or any other lawful predicate, and because it was effected in deliberate disregard of facts known to the Responding Officers that indicated Harris's possession of the child was unlawful.

77.    As a direct and proximate result, K.H. has suffered the damages alleged in this Complaint.

WHEREFORE, K.H. demands judgment against Officer Andrew Bryant, Officer Doe 1, and Supervisor Doe 2, jointly and severally, for compensatory damages, punitive damages, attorneys' fees and costs under 42 U.S.C. § 1988, and such other relief as the Court deems just.

**COUNT IV – *MONELL* LIABILITY – AFFIRMATIVE POLICY AND CUSTOM (42 U.S.C. § 1983; All Plaintiffs against the City of Orange Beach)**

78.    Plaintiffs reallege and incorporate by reference the factual allegations set forth in paragraphs 12 through 59 of this Complaint.

79.    The City, through its final policymaker the Chief, maintained an actual policy, custom, or persistent practice of permitting and ratifying the misclassification of apparent criminal incidents—including burglary, theft, custodial interference, and domestic violence—as "civil matters," without conducting the investigation required by OBPD Policy §§ 430.3(b), 600.3.1, and 310.4(j).

80.    That custom is evidenced by, among other things: (i) the Responding Officers' and Supervisor Doe 2's conduct on September 21, 2025; (ii) the absence of any disciplinary or corrective action following that conduct; (iii) the City's denial of Bryce's public-records request; (iv) the absence of decisional structure in OBPD Policy § 430.3(b) for distinguishing civil from criminal matters; and (v) on information and belief, prior incidents of similar misclassification, to be developed in discovery.

81.    The custom was the moving force behind the constitutional violations alleged in Counts I, II, and III of this Complaint.

82.    As a direct and proximate result, K.H., Bryce, and Shane have suffered the damages alleged in this Complaint.

22

WHEREFORE, Plaintiffs demand judgment against the City of Orange Beach for compensatory damages, attorneys' fees and costs under 42 U.S.C. § 1988, declaratory relief, and such other relief as the Court deems just. Plaintiffs do not seek punitive damages against the City. See *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981).

### COUNT V – *MONELL* LIABILITY – FAILURE TO TRAIN AND SUPERVISE (42 U.S.C. § 1983; All Plaintiffs against the City of Orange Beach)

83. Plaintiffs reallege and incorporate by reference the factual allegations set forth in paragraphs 12 through 59 of this Complaint.

84. The City, through the Chief, failed to train OBPD officers on: (i) the distinction between civil disputes and apparent felonies under OBPD Policy § 430.3(b); (ii) the application of the Domestic Violence Policy (§ 310) to incidents involving biological parents, grandparents, and persons sharing a child in common; (iii) the verification of custodial status at the scene of a custody-related dispute; and (iv) the recognition of child abduction and human-trafficking indicators.

85. The need for such training was obvious. A patrol officer's threshold decision whether to treat a call as criminal or civil is the most common and consequential decision OBPD officers face. The known associate of an illegal alien with cartel ties—taking a child from her custodial parent at dawn after a forcible entry—is precisely the species of obvious risk that *City of Canton v. Harris*, 489 U.S. 378 (1989), identifies as requiring training even in the absence of a prior pattern.

86. The City failed to supervise the Responding Officers, Supervisor Doe 2, and other OBPD personnel. No supervisor consultation was required by policy before

a "civil matter" classification, and none occurred. No after-action review or discipline followed the September 21, 2025 response.

87.     The City's failures to train and supervise constituted deliberate indifference to the constitutional rights of persons, including K.H. and her custodial family, with whom OBPD officers come into contact.

88.     The City's failures were the moving force behind the constitutional violations alleged in Counts I, II, and III of this Complaint.

89.     As a direct and proximate result, Plaintiffs have suffered the damages alleged in this Complaint.

WHEREFORE, Plaintiffs demand judgment against the City of Orange Beach for compensatory damages, attorneys' fees and costs under 42 U.S.C. § 1988, declaratory and injunctive relief, and such other relief as the Court deems just.

## COUNT VI – *MONELL* LIABILITY – FAILURE TO ADOPT NECESSARY POLICIES
### (42 U.S.C. § 1983; All Plaintiffs against the City of Orange Beach)

90.     Plaintiffs reallege and incorporate by reference the factual allegations set forth in paragraphs 12 through 59 of this Complaint.

91.     The City, through the Chief, failed to adopt policies addressing: (i) the response to reported child abductions and parental kidnappings; (ii) the verification of custodial status before officers facilitate the transfer of a child; (iii) the recognition of and response to indicators of human trafficking; and (iv) a structured decision framework, supervisory-consultation requirement, or checklist for classifying a call as "civil" rather than "criminal."

24

92.     The need for each of these policies was obvious. Each addresses a recurring situation that small-jurisdiction police departments—and particularly those serving Gulf-coast tourism communities like Orange Beach—predictably encounter. The vendor of OBPD's policy manual, Lexipol, has made model policies in each category available to OBPD, and OBPD has declined to adopt them.

93.     The City's policy omissions constituted deliberate indifference within the meaning of *Board of County Commissioners v. Brown*, 520 U.S. 397 (1997), and *Canton*, 489 U.S. at 390 n.10.

94.     Those omissions were the moving force behind the constitutional violations alleged in Counts I, II, and III of this Complaint. Had any of the omitted policies been in place, the Responding Officers would have been required to verify custody, treat the call as a felony investigation, document the incident, and consult a supervisor before permitting K.H.'s removal.

95.     As a direct and proximate result, Plaintiffs have suffered the damages alleged in this Complaint.

WHEREFORE, Plaintiffs demand judgment against the City of Orange Beach for compensatory damages, attorneys' fees and costs under 42 U.S.C. § 1988, declaratory and injunctive relief (including a directive to adopt and enforce the policies identified in this Count), and such other relief as the Court deems just.

25

## COUNT VII – SUPERVISORY LIABILITY
**(42 U.S.C. § 1983; All Plaintiffs against Chief David Johnson, in his individual capacity, and Supervisor Doe 2, in his/her individual capacity)**

96.   Plaintiffs reallege and incorporate by reference the factual allegations set forth in paragraphs 12 through 59 of this Complaint.

97.   The Chief and Supervisor Doe 2 are liable under § 1983 for the constitutional violations of their subordinates where they personally participated in the unconstitutional conduct, where there is a causal connection between their actions and the violation, or where they were aware of a widespread history of abuse such that they were on notice of the need for corrective action and failed to take it. See *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003).

98.   Supervisor Doe 2 personally participated in or ratified the Responding Officers' classification of the September 21, 2025 incident as a "civil matter" and the resulting transfer of K.H., with knowledge of the facts described in this Complaint.

99.   The Chief was on notice—through OBPD's own policy framework, through the Lexipol policy library, and on information and belief through prior incidents—of the need to train officers on, and to adopt policies addressing, the matters described in Counts V and VI. The Chief failed to take corrective action.

100.   As a direct and proximate result, Plaintiffs have suffered the damages alleged in this Complaint.

WHEREFORE, Plaintiffs demand judgment against the Chief and Supervisor Doe 2, jointly and severally with the Responding Officers, for compensatory damages,

punitive damages, attorneys' fees and costs under 42 U.S.C. § 1988, and such other relief as the Court deems just.

## COUNT VIII – DENIAL OF ACCESS TO COURTS
### (42 U.S.C. § 1983; Bryce and Shane against the City of Orange Beach)

101.   Bryce and Shane reallege and incorporate by reference the factual allegations set forth in paragraphs 38 through 40 of this Complaint.

102.   The City's denial of Bryce's and his counsel's public-records request, in the absence of any identified statutory exemption and despite public disclosure of substantially the same materials in the federal criminal proceeding against Harris, was intended to or had the predictable effect of impeding Plaintiffs' ability to investigate and pursue their constitutional and state-law claims against the City and its officers.

103.   Bryce and Shane have a non-frivolous, underlying claim—the claims pleaded in this Complaint—that the City's records suppression has burdened.

104.   As a direct and proximate result, Bryce and Shane have incurred and will incur additional investigative costs, delay, and impairment of their ability to litigate, in violation of their rights under the First and Fourteenth Amendments. See *Christopher v. Harbury*, 536 U.S. 403 (2002); *Chappell v. Rich*, 340 F.3d 1279 (11th Cir. 2003).

WHEREFORE, Bryce and Shane demand judgment against the City of Orange Beach for compensatory damages, declaratory and injunctive relief (including disclosure of the withheld records), attorneys' fees and costs under 42 U.S.C. § 1988, and such other relief as the Court deems just.

27

## COUNT IX – NEGLIGENCE
### (State Law; All Plaintiffs against Officer Andrew Bryant, Officer Doe 1, and Supervisor Doe 2)

105. Plaintiffs reallege and incorporate by reference the factual allegations set forth in paragraphs 12 through 59 of this Complaint.

106. Officer Andrew Bryant, Officer Doe 1, and Supervisor Doe 2 owed Plaintiffs a duty of reasonable care in the performance of their law-enforcement duties at the Tarpon Lane Home on September 21, 2025. That duty arose from the officers' voluntary assumption of the response to Plaintiffs' 911 call and from applicable OBPD Policy, including Policy §§ 430.3(b), 600.3.1, 310.4(a), and 338.4, each of which imposed specific affirmative obligations on the Responding Officers and their supervisor once they arrived at a scene involving an apparent burglary, theft, domestic-violence incident, and the welfare of a three-year-old child.

107. They breached that duty by, among other things, failing to investigate the apparent burglary, theft, and abduction; failing to verify custodial status; failing to consult a supervisor; failing to prepare a report; and directing Bryce and Shane to relinquish K.H. to Harris and the Co-Conspirator. Specifically: (a) although Shane and Bryce reported that Harris had entered without permission, had taken property, and was attempting to remove K.H. from the home of her sole legal custodian, the Responding Officers accepted Harris's unverified representations at face value and classified the incident as a non-criminal "civil matter" without conducting any investigation, in violation of Policy § 430.3(b); (b) despite OBPD Policy § 310.4(j)'s requirement of enforcement action where probable cause exists, and Policy §

310.9(a)'s requirement of supervisor approval for any decision not to arrest, the Responding Officers took no enforcement action and obtained no such approval; (c) despite Policy § 338.4's directive that a child not be left without appropriate care, and Policy § 338.3.1(b)(1)'s directive to place a child with the existing custodial parent, Officer Bryant directed that K.H. be transferred to Harris, a person with no verified custodial rights who had just committed a forcible entry; and (d) Supervisor Doe 2 approved or ratified this disposition without requiring any of the investigative steps or documentation mandated by OBPD Policy.

108. Their breach proximately caused the injuries alleged in paragraphs 53, 54, and 55 of this Complaint. But for the Responding Officers' directive to relinquish K.H.—a directive Bryce and Shane had no practical ability to refuse—K.H. would not have been removed from the Tarpon Lane Home. Harris immediately transported K.H. out of state and ultimately across the United States–Mexico border, where K.H. suffered the physical abuse, psychological trauma, and developmental harm described herein. The injuries were the foreseeable result of entrusting a three-year-old child to a person who had committed a forcible entry, whose representations were unverified, and who was accompanied by an individual whose identity and criminal history the officers had not checked.

WHEREFORE, Plaintiffs demand judgment against Officer Andrew Bryant, Officer Doe 1, and Supervisor Doe 2, jointly and severally, for compensatory and punitive damages and such other relief as the Court deems just.

29

## COUNT X – WANTONNESS
### (State Law; All Plaintiffs against Officer Andrew Bryant, Officer Doe 1, and Supervisor Doe 2)

109.    Plaintiffs reallege and incorporate by reference the factual allegations set forth in paragraphs 12 through 59 of this Complaint.

110.    The conduct of Officer Andrew Bryant, Officer Doe 1, and Supervisor Doe 2 was undertaken with reckless or conscious disregard of the rights and safety of K.H., Bryce, and Shane, and with knowledge of the danger likely to result. See Ala. Code § 6-11-20(b)(3). The officers acted with reckless or conscious disregard of that danger in that: (a) they were expressly told that Harris had entered the home without permission, had not been in K.H.'s life for approximately one year, and was in the company of an unidentified individual—facts that, taken together, made the risk of harm to the child readily apparent; (b) Officer Bryant nonetheless directed the transfer of K.H. to Harris while acknowledging he had not verified custodial status and had not conducted any investigation into the reported criminal conduct; (c) OBPD Policy §§ 310.4(a) and 310.9(a) required the officers to treat the call as a high-priority domestic-violence matter and to obtain supervisor approval before declining to arrest, yet they did neither; and (d) Harris's own false statements to the officers—that she resided in Robertsdale and would return K.H. within a week—were not tested, challenged, or verified, even though the officers had the means to do so. This was not a judgment call made in ignorance; it was a decision made in conscious disregard of facts that plainly signaled danger to a three-year-old child.

30

111.  Their wantonness proximately caused the injuries alleged in paragraphs 53, 54, and 55 of this Complaint. The wanton transfer of K.H. to Harris directly set in motion the chain of events—interstate transport, cross-border trafficking, exposure to cartel actors, and the physical and psychological harm K.H. sustained in Mexico—that is the foreseeable and direct consequence of recklessly placing a toddler in the custody of an unverified adult who had just committed a forcible entry.

WHEREFORE, Plaintiffs demand judgment against Officer Andrew Bryant, Officer Doe 1, and Supervisor Doe 2, jointly and severally, for compensatory and punitive damages and such other relief as the Court deems just.

### COUNT XI – NEGLIGENT HIRING, TRAINING, SUPERVISION, AND RETENTION
#### (State Law; All Plaintiffs against the City of Orange Beach)

112.  Plaintiffs reallege and incorporate by reference the factual allegations set forth in paragraphs 12 through 59 of this Complaint.

113.  The City owed Plaintiffs a duty of reasonable care in the hiring, training, supervision, and retention of OBPD personnel.

114.  The City breached that duty as set forth in this Complaint. The City breached that duty in the following respects: (a) Training—OBPD failed to train its officers on the distinction between civil disputes and apparent felonies under Policy § 430.3(b), on the verification of custodial status before facilitating the transfer of a child, on child-abduction and parental-kidnapping recognition and response, and on human-trafficking indicators, despite the availability of Lexipol model policies on each of those topics and despite Orange Beach's status as a Gulf-coast tourism

31

destination where such situations are foreseeable; (b) Supervision—OBPD failed to require supervisor consultation before a responding officer could classify a call as a "civil matter" under Policy § 430.3(b), and Supervisor Doe 2 ratified the Responding Officers' classification and disposition without conducting any independent review; and (c) Retention and Discipline—OBPD took no disciplinary or corrective action following the September 21, 2025 response, despite the filing of a Verified Notice of Claim on March 26, 2026, and despite OBPD Policy § 1110.3.2(e)'s requirement that such claims generate personnel complaints. The absence of any post-incident review or discipline demonstrates that the breach reflected not an isolated failure but an entrenched pattern or practice permitted by the City.

115. The City's breach proximately caused the injuries alleged in this Complaint. Had the City properly trained its officers on custodial-status verification, child-abduction response, and the civil/criminal distinction, or required supervisor approval before a civil-matter classification, or maintained a policy framework addressing child-welfare transfers, the Responding Officers would not have directed the transfer of K.H. to an unverified adult without investigation—and K.H., Bryce, and Shane would not have suffered the harms described herein.

WHEREFORE, Plaintiffs demand judgment against the City of Orange Beach for compensatory damages and such other relief as the Court deems just.

## COUNT XII – LOSS OF FILIAL AND FAMILIAL CONSORTIUM
### (State Law; Bryce and Shane against all Defendants)

116. Bryce and Shane reallege and incorporate by reference the factual allegations set forth in paragraphs 12 through 59 of this Complaint.

117. As a direct and proximate result of the conduct of the Defendants, Bryce and Shane were deprived of the care, companionship, society, and association of K.H. during the period of her abduction and continue to suffer impairment of that relationship. Alabama recognizes a claim for loss of parental consortium by a parent arising from injury to a child, and a claim for loss of filial consortium by a child's close family member where the relationship is sufficiently close. As K.H.'s sole legal and physical custodian, and as the owner of the home in which K.H. resided, Bryce and Shane each had a close, established relationship of care and daily association with K.H. that was abruptly severed by Defendants' conduct. The deprivation was not temporary inconvenience: K.H. was trafficked across an international border, held in Mexico among cartel actors, and subjected to physical and psychological abuse, during all of which time Bryce and Shane were wholly deprived of her society, companionship, and association. Bryce further suffered the loss of the day-to-day exercise of his custodial role—the feeding, comforting, and raising of his three-year-old daughter—for the duration of the abduction. Both Bryce and Shane continue to suffer ongoing impairment of the parent-grandparent-child relationship as a result of the trauma K.H. experienced, the fear of never seeing her again, and the harm to her developmental and psychological wellbeing.

WHEREFORE, Bryce and Shane demand judgment against the Defendants, jointly and severally, for compensatory damages, with punitive damages against the Individual Defendants only, and such other relief as the Court deems just.

33

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Honorable Court enter a judgment in favor of Plaintiffs and against Defendants as follows:

1.      Award compensatory damages in an amount to be determined by the jury, sufficient to fully compensate K.H., Bryce, and Shane for the injuries described herein;

2.      Award punitive damages against the Individual Defendants in their individual capacities, in an amount sufficient to punish and deter the conduct alleged;

3.      Enter declaratory relief that the City's policies, customs, training, and supervision violated and continue to violate Plaintiffs' constitutional rights;

4.      Enter injunctive relief directing the City to (a) adopt, train on, and enforce written policies addressing child abduction, custodial-interference verification, and human-trafficking recognition; (b) establish a structured decision protocol for the "civil vs. criminal" threshold classification, including mandatory supervisor consultation; and (c) disclose the records improperly withheld from Plaintiffs;

5.      Award reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988;

6.      Award pre- and post-judgment interest at the maximum lawful rate; and Grant such other and further relief as this Court may find just and proper under the circumstances.

**PLAINTIFFS DEMAND TRIAL BY
STRUCK JURY ON ALL ISSUES SO TRIABLE**

Respectfully Submitted,

*/s/ Kristopher O. Anderson*
KRISTOPHER O. ANDERSON
AL Bar No.: ASB-4318-O68A

*/s/ Michael A. Rogers*
MICHAEL A. ROGERS
AL Bar No.: ASB-8291-G67A

YATES ANDERSON
4851 Wharf Parkway, Ste D-230
Orange Beach, AL 36561
kris@yatesanderson.com
mike@yatesanderson.com

*Attorneys for Plaintiffs*

35